IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            PLAINTIFF,<br>vs.<br><br>KAREN KRISTINA KOCH,<br><br>            DEFENDANT. | CASE NO. 4:05-CR-00042-02-RRB<br><br><br>REPORT AND RECOMMENDATION RE: DEFENDANT'S MOTION TO SUPPRESS(DOCKET NO.22) |

    Defendant Karen Kristina Koch has moved this Court for an order suppressing statements she made to the police on November 28th, 2005. In effect, defendant asserts her statements were involuntarily made because she was in custody and did not receive a proper warning in accordance with <u>Miranda v. Arizona</u>, 884 U.S. 475 before questioning began.  She also claims she invoked her right to counsel, was nevertheless questioned and therefore her Fifth Amendment rights were violated.

    The government has opposed the defendant's motion, and claims the defendant was not in custody during the time she was questioned by the police.  The government asserts no <u>Miranda</u> warning was required to be given the defendant nor were the police required to cease asking the defendant questions when she asked for a lawyer.

    An evidentiary hearing was held on the defendant's motion on January 18th, 2006 at which time the court heard testimony from Alaska State Trooper Sargent Wall (Transcript at Docket No. 44). Based upon the foregoing, this Court now submits its report and recommendation.

1

FACTS

On November 28th, 2005 a confidential informant appeared before State Magistrate Hammers and testified in support of an application for a warrant to search a manufactured home (house-trailer) located at 1038 Lakeview Terrace, Fairbanks, Alaska. The police asked for and received a "no-knock" entry warrant because they received information that the residence might contain a fully automatic machine gun with a silencer and substantial amounts of cocaine and money. Tr. p.6. Sgt. Wall testified the police did not know for sure whether or not any children might be present in the residence at the time they wanted to execute the search warrant. Tr. p.8.

When the search warrant was executed, the police were dressed in tactical gear comprised of heavy ballistic vests and ballistic helmets. They were armed with a variety of weapons including shot-guns, semi-automatic hand guns, and automatic rifles. Tr. p.9. A distraction device was employed inside the residence prior to the police entering the structure. The police immediately heard screams from the residence. Sgt. Wall thought the screams were from children, and another officer present, Lieutenant Johnson, believed they were from adults. Tr. p.9.

Immediately after the distraction device detonated, Sgt. Wall observed the defendant open the back door to the residence. From his defensive position, he shouted that he was a police officer and ordered the defendant to get down. Instead, the defendant closed the door and Sgt. Wall could hear her running into the back bedroom on the west side of the structure. There, other members of his team contacted the defendant and placed her in handcuffs. Tr. p.9. The defendant was taken to a police car

and placed in the back seat of the cruiser. Sgt. Wall stated this was done to allow the police officers to sweep the residence again for anyone that might be hiding in the residence or posing a danger to the SERT team. Tr. p.10.  The temperature outside the residence on the 28th of November, 2005, was well below zero. Tr. p.10.

After the defendant was placed in the heated police car, Sgt. Wall re-entered the residence to make a cursory sweep, trying to identify anything that was immediately obvious to him that could pose a danger to his team. He subsequently went outside and make contact with the defendant who was still hand cuffed and in the back seat of the police car.  Tr. p. 10.  The conversation that took place between Sgt. Wall and the defendant was recorded at the scene and played at the evidentiary hearing. That conversation is reproduced in its entirety below. (Beginning at Transcript, p.15):

UNIDENTIFIED VOICE: We'll -- you can speak with her and then let me know what you want to do, if we can take them someplace close--

SGT. WALL: Probably should--

UNIDENTIFIED VOICE: --get her out of the handcuffs and we'll take her to someplace close, hopefully.

SGT. WALL: Sounds good.

UNIDENTIFIED VOICE: Anyway, get her out of here.

SGT. WALL: Okay, ma'am.

MS. KOCH: Yeah.

SGT. WALL: I'm Sgt. Wall, I'm with the State Trooper drug unit--

MS. KOCH: Okay.

SGT. WALL: --okay? We've got a search warrant for your residence.

MS. KOCH: Okay.

SGT. WALL: Okay? You've got a safe in there.

MS. KOCH: It's not mine.

SGT. WALL: Whose safe is it, ma'am?

MS. KOCH: I don't even have access--

SGT. WALL: You're not under arrest or anything, you know, you're just going to be take--

MS. KOCH: God, what do you guys come in there scaring my kids like that--

SGT. WALL: Well, because of the--

MS. KOCH: --without even saying anything.

SGT. WALL: Because - we yelled police, it's--

MS. KOCH: I --

SGT. WALL: -- because of the information we had, ma'am.

MS. KOCH: What information?

SGT. WALL: Well, we can go over that at a later time okay?

MS. KOCH: What I would like to know is why?

SGT. WALL: Okay, we have a search warrant for the residence for drugs and weapons --

MS. KOCH: Okay.

SGT. WALL: --okay? We're told that there are all kinds of machine guns and everything else in there.

MS. KOCH: Okay, I -- I actually --

SGT. WALL: So you can see why --

MS. KOCH: -- I don't -- I don't do anything with (indiscernible) --

SGT. WALL: What's your name, ma'am?

MS. KOCH: My name's Karen but I want to talk with a lawyer.

SGT. WALL: Okay, what's your last name, Karen?

MS. KOCH: Because I don't know what's going on.

SGT. WALL: What's your last name, Karen?

MS. KOCH: It's Koch.

SGT. WALL: Karen Koch?

MS. KOCH: Uh-huh.

SGT. WALL: Okay.

MS. KOCH: Can I -- can I --

SGT. WALL: Karen, then we're going to go ahead and have you and your children taken over to FPD or someplace else close, okay?

MS. KOCH: All right.

SGT. WALL: All right, whose safe is it, can you tell me who I can contact?

MS. KOCH: Can I -- can I go with my children --

SGT. WALL: Oh, we're going to take you, I just don't think -- you can't all fit in there, it won't hold all--

MS. KOCH: Yes, it can.

SGT. WALL: Okay, we'll let them do it. Who can I call to open the safe --

MS. KOCH: Can I talk to a lawyer --

SGT. WALL: --is (indiscernible)

MS. KOCH: --first? I don't even know --

SGT. WALL: Absolutely, that's fine. If you must put your feet in there, we'll tell them and they'll make arrangements to --

MS. KOCH: Can they give me a phone so I can call somebody?

SGT. WALL: Okay, we will in just a second. Just go ahead and tuck your feet in there. Thank you.

SPECIAL AGENT FORAN: Do you live in the trailer?

MS. KOCH: A friend of mine -- Well, I do live there but--

SPECIAL AGENT FORAN: Is that -- which bedroom do you stay in?

MS. KOCH: I stay with my daughter in the back room.

SPECIAL AGENT FORAN: Who -- who stays in the other end, the room with the big safe in it, who stays in that room?

MS. KOCH: That's Sharon's room.

>SPECIAL AGENT FORAN: Whose -- whose room?
>
>MS. KOCH: Sharon.
>
>SPECIAL AGENT FORAN: Sharon who?
>
>MS. KOCH: Sharon Powers.
>
>SPECIAL AGENT FORAN: There's some guy living there too, what's the guy's name?
>
>MS. KOCH: Jay.
>
>SPECIAL AGENT FORAN: Jay what?
>
>MS. KOCH: Colette.
>
>SPECIAL AGENT FORAN: Jay Colette -- Jay Colette's room? Okay, there's --
>
>MS. KOCH: Can I talk to somebody first? I mean, I don't even know what the hell's going on.
>
>SPECIAL AGENT FORAN: There's a scale with some white powder residue on it, is it yours?
>
>MS. KOCH: No.
>
>SPECIAL AGENT FORAN: Okay, that's what I -- that's all I want to know, it's not yours, okay.
>
>SGT. WALL: Thank you.

(End of audio recording. Transcript, p.19)


When asked whether or not his "no knock" entry into the residence frightened the defendant, Sgt. Wall testified, "Well, she screamed and tried to run out the back door. Whether that was

due to the entry team or the distraction device, you know, I don't know. I'm sure it probably did frighten her." Tr. p.23. Sgt. Wall also testified that the defendant was handcuffed, "ten, fifteen minutes, tops." Tr. p.23.  He was surprised by the presence of children in the residence because he did not realize children would be there. Tr. p.24.

When asked whether or not the defendant expressed concern for her children when she was in the police car, Sgt. Wall testified, "Sure. We were going to transport them some place, and I didn't believe the three of them could fit in the back of a -- of a small Ford Taurus."  Tr. p.25.

On questioning by the Court, Sgt. Wall estimated that it was, "maybe three minutes to get her from the residence outside after the teams had done their sweep and get her to the vehicle." Tr. p.26.  Sgt. Wall further testified that the defendant was in handcuffs outside of the residence for a period of fifteen minutes until she was released. The Defendant was transported to another location with her children and released.  The defendant was always handcuffed during questioning.  When asked why he stopped questioning the defendant, Sgt. Wall testified, "I didn't feel she was going to give me any other information that was going to assist me in – in the investigation at that time. And she told me that she wasn't going to – to divulge any information, she wasn't going to provide any information for me to proceed in who I could contact that – that may be helpful to me." Tr. p.28.

When asked if he considered the defendant a suspect at the time he questioned her, Sgt. Wall stated, "It wasn't until our further investigation inside the residence that we decided that – that she was indeed a suspect." Tr. p.28.

## WAS THE DEFENDANT IN CUSTODY
## AT THE TIME SHE WAS INTERROGATED BY THE POLICE?

The government contends the defendant's statements must not be suppressed as a violation of <u>Miranda</u> because she was not was not in custody at any time during the interrogation by Sgt. Wall and S.A. Foran on November 28th, 2005. In support of their position, the government refers the Court to <u>U.S.A. v. Lennick</u>, 917 F.2d 974,977 (7th Cir. 1990). In <u>U.S.A. v. Lennick</u>, the U.S. Court of Appeals for the 7th Circuit stated the following (at 977):

> [1] In order to establish a custodial relationship, a defendant must either show that he or she was formally arrested, or that he or she was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained. *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *Hocking*, 860 F.2d at 772. In the latter case, the test is not whether the defendant was under a subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave. *Boden,* 854 F.2d at 991. Thus, "[t]here is no 'seizure' subject to the Fourth Amendment unless a reasonable person in [defendant's] position would have believed that he was not free to ignore [the police] and continue on his way; the test is objective." *Id.*
>
> [2] A totality of the circumstances test

is used to determine whether a reasonable person would have believed he or she was free to leave. Under this analysis, we look to such factors as the length of the interrogation, the purpose of the questioning, and the location of the interrogation. *Hocking,* 860 F.2d at 773; *Teslim,* 869 F.2d at 321. Since Lennick does not claim that he was formally arrested in the courthouse hallway, he must demonstrate that reasonable person in his position would have believed that he or she was not free to ignore agent Allbritten and walk away. *Hocking*, 860 F.2d at 772.

At Docket No.30, the government correctly asserts that:

> An individual is "in custody" at the point that a reasonable person would feel that he or she was not free to terminate the interrogation. Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995). 'In determining whether an individual was in custody, a Court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is whether there [was] a 'formal arrest' or restraint on freedom of movement to the degree associated with a formal arrest. Id. (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983) (per curiam)).
> 
> The court must "employ an objective standard, asking whether a reasonable person

10

>   in the interviewee's position would consider
>   himself or herself free to leave." <u>People of
>   the Territory of Guam v. Palomo</u>, 35 F.3d
>   268,375 (9th Cir. 1994).

The government places great weight on the fact that Sgt. Wall informed the defendant she was not under arrest and that she was going to be transported to another location and released in a short period of time.  The government points out that this is exactly what happened and that the defendant was released approximately fifteen minutes after she was initially handcuffed by the police and taken from her residence.

The government, citing <u>U.S.A. v. Lennick</u>, asserts that, "The purpose of the questioning also indicates whether a reasonable person would believe they were in custody." (Docket No.30, p.6).

It is clear from the taped conversation produced at her evidentiary hearing that Sgt. Wall and S.A. Foran were trying to determine whether or not the defendant had control of and access to contraband drugs and weapons in the safe.  Sgt. Wall asked the defendant if she had a combination to the safe he believed at the time contained the gun, money and cocaine.  While he may have wanted help getting into the safe as quickly as he could, Sgt. Wall's  questions to the defendant had the effect of determining whether or not the defendant had control over the safe that contained the contraband. S.A. Foran's questions on the other hand served no other purpose than to elicit incriminating statements from the defendant about ". . .a scale with some white powder residue on it. . ." and "Who stays in the other end, the room with the big safe in it, who stays in that room?"  However, as <u>U.S.A. v. Lennick</u> points out, the nature and intent of the

questioning is not alone dispositive of whether or not a person is in custody.

The police clearly and unambiguously told the defendant she was not under arrest. But telling an individual they are not under arrest does not mean they are not in custody. If that were the case, maliciously motivated police officers would be able to immunize themselves against any impermissible questioning by merely telling a suspect he or she was not under arrest.

The facts show that for a fifteen minute period, the defendant was not free to leave. She was handcuffed, placed in the back of a police car, and had no freedom of movement. In fact, she was only able to leave the area because the police transported her to another location and released her.

The defendant was understandably frightened and concerned for her children because of the way the police entered her home, handcuffed her and then separated her from her young children.

There is no question that the defendant told the police officers, in unambiguous language, that she wanted an attorney before they began questioning her about who lived in the bedroom where the safe was kept. Sgt. Wall testified he stopped talking to the defendant because it was clear to him that she was not going to give him any information. The questioning by S.A. Foran occurred immediately after Sgt. Wall stopped his interrogation. It is clear from the transcript that the defendant did not initiate a new conversation with S.A. Foran.

The government asserts that, "The conversation between the officers and the defendant lasted less than two minutes, and was primarily focused on informing the defendant about the search warrant, and seeking a way to access a safe in the residence." (Docket No. 30, p.7). In fact, the defendant's answers to

questions about who occupied the bedroom where the safe was located serves as the sole basis for prosecuting the defendant.

The government asserts that, "A reasonable person, especially someone who had contact with law enforcement officers in the past, would understand they were not in custody." (Docket No. 30, p.7). In fact, the opposite may be said to be true. If a "veteran" defendant wants to stop questioning and requests a lawyer, they probably do so because they _know_ they are in custody.

The defendant was forcibly taken from her home and not released until she was transported in a police vehicle to a different location. She was handcuffed the entire time she was questioned by police, and was separated from her children by heavily armed men who entered her house without notice by tossing in a "distraction" device just before they came through the door. Before questioning, and before any incriminating statements were made, the defendant identified herself and asked for an attorney. Sgt. Wall stopped interrogating her because he believed he was not going to get any information from her. Immediately after questioning of the defendant by Sgt. Wall stopped, it was resumed by S.A. Foran who questioned the defendant under the identical circumstances present during the first interrogation.

During the time defendant's freedom of movement was restrained, a reasonable person in the defendant's position would have believed she was not free to leave and, although she was told she was not under arrest, she was subjected to the same conditions of a formal arrest.

A reasonable person in the defendant's position would not have believed she was free to leave during the fifteen minutes she was held by the police. A reasonable person in the defendant's position would have concluded that the police, and

only the police, could decide if she would be released and if so, when.

Under the totality of the circumstances test set forth in <u>Linnick</u>, this court finds the defendant was in police custody when they questioned her and therefore, the police should have advised her of her right to an attorney in accordance with <u>Miranda v. Arizona</u>, 884 U.S. 475.  Because they did not do so, all incriminating statements made by defendant while in police custody on November 28, 2005, must be suppressed.  The court need not rule on whether a non-custodial interrogation must stop when an individual requests a lawyer.

## RECOMMENDATION

Based upon the forgoing, it is hereby recommended the defendant Karen Kristina Koch's motion to suppress at Docket No. 22 be GRANTED.

Dated at Fairbanks, Alaska this 10th day of May, 2006.

/S/Terrance W. Hall

TERRANCE W. HALL
U.S. MAGISTRATE JUDGE


Pursuant to Local Magistrate Rule 12(C),a party seeking to object to this proposed finding or recommendation shall file written objections with the Clerk of U.S. District Court no later than **May 22, 2006**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waive the right to contest those findings on appeal. **McCall v. Andres**, 627 F.2d 1195, 1187-89 (9th Cir.) <u>cert denied</u> 450 U.S. 996 (1981). **Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objections, and the points and authorities**

**in support.** Response(s) to the objections shall be filed no later than the close of business **May 30, 2006**. No reply will otherwise be received. The parties shall otherwise comply with provisions of Local Magistrate Rule 12(C).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kencheloe, 796 F.2d 308 (9th Cir. 1986).